In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3887

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANDREW EMMETT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 137—**Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 23, 2002—DECIDED MARCH 3, 2003

Before DIANE P. WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* In January 2000, reluctant bank robber Andrew Emmett walked into Advance Bank in Chicago and handed the teller a note that read: "Give me all your hundreds, and don't hit any alarms or people start getting hurt. You have 30 seconds." When the teller, Amanda Vega, asked the robber if he was serious, he said he was and told her not to call anyone or push any buttons or people would get hurt. The robber then reached into his jacket, which Vega took as a sign that he had a gun. Vega slowly walked away and gave the note to her supervisor, Carlos Mucha. While Mucha was reading the note, Emmett left the bank.

Undaunted, Emmett walked down the street and tried again. At Manufacturers Bank, Emmett handed the teller, Pamela Benkovich, an almost identical note ("Give me all your hundreds or people get hurt. No alarms. You have 30 seconds."). Benkovich opened her drawer to discover she didn't have any hundreds. As she looked in her drawer, the robber barked "give it to me now, lady," and put his hand in his pocket. Benkovich, believing that Emmett had a gun, ducked behind the counter and told the teller next to her "Pinocchio's nose is growing," the bank's code for a robbery. Frustrated by the delay, Emmett again turned around and walked out of the bank.

About a month later, Vega, the teller at the first bank, and Mucha, her supervisor, picked Emmett out of a photo array. Armed with the identifications, and certainly other information as well, FBI agents went to the Family Guidance Clinic, a methadone treatment facility on Chicago's north side, where they knew Emmett had an appointment. Emmett showed up, was arrested, and was taken to a police station where he made a statement admitting, essentially, that he tried to rob the banks. He was then charged with two counts of bank robbery in violation of 18 U.S.C. § 2113(a).

With a pretty strong case against him, Emmett's best hope for survival was to kill the government's evidence, and he sought to do so by filing a motion to suppress. In the motion, he sought to suppress the identifications made by Vega and Mucha and the fruits of those identifications, namely his incriminating statements to the FBI. Emmett supported this claim by saying the FBI somehow improperly "used" his probation officer to take Emmett's photograph as part of its investigation into the robberies. Pointing to a Ninth Circuit case, *United States v. Richardson*, 849 F.2d 439 (9th Cir. 1988), Emmett claimed his probation officer violated his Fourth Amendment rights by acting as a "stalking horse" for the agents.

The district court was unimpressed and declined Emmett's request for an evidentiary hearing. With the evidence intact, the government's road to victory was secure, as Emmett's arguments at trial that the identifications were unreliable and that the FBI agent who took the statement was not worthy of belief—he took no signed or videotaped statement and generally "played fast and loose with what happened"—were not going to be the kind of claims that impress a jury. Emmett was convicted and sentenced to a term of 10 years.

On this appeal, Emmett argues error on the suppression decision, trial error growing out of "prejudicial" closing argument comments by the government prosecutor, and a few sentencing issues. We start with the suppression issue.

In his suppression motion, Emmett claimed that FBI agents met with his probation officer (he was on supervised release at the time) and discussed the robberies. He said the agents asked the probation officer to take Emmett's picture and that the officer then ordered Emmett to report to the probation office for that purpose. Once there, Emmett says, his picture was taken and subsequently given to the FBI agents, who used it in a photo array shown to the bank tellers. The results of this were identifications of Emmett as the robber and his incriminating statements after arrest to the agents.

The problem (the first—there are two) with all this is that it didn't happen that way. Emmett's recitation of this sequence of events was conjecture: he really didn't know how things happened. When the government responded—with facts showing that the probation officer took the photograph at a routine meeting before the FBI ever suspected Emmett was involved in the bank robberies, there was no way Emmett could show that the probation officer was "collaborating with the FBI" to

deny Emmett his Fourth Amendment protection. So there was no need for an evidentiary hearing.

But even if the FBI had used Emmett's probation officer exactly as Emmett claimed, there would be no Fourth Amendment violation. Even the Ninth Circuit (which provides the only arguably solid support for Emmett's claim) holds that someone on probation is not entitled to the same protection as other citizens. *See United States v. Jarrad*, 754 F.2d 1451 (9th Cir. 1985). A probation officer (or a parole officer, as the case may be) does not violate his "client's" rights merely by aiding police, which, at worst, is all that happened here.

In addition, we think it clear that a person has no expectation of privacy in a photograph of his face. *See United States v. Doe*, 457 F.2d 895, 898 (2d Cir. 1972) ("[T]here is no 'reasonable expectation of privacy' about one's face."). The officers could have taken Emmett's photo themselves (either with his consent or through surveillance), or gotten it from other sources, like driver's license records. For these reasons, the district court did not err in denying Emmett's suppression motion without a hearing.

Next, Emmett claims he was denied a fair trial by comments made during closing arguments by the prosecutor, who noted the defense's failure to call witnesses or ask questions to refute Vega's testimony that the jacket Emmett was wearing at the time of his arrest was "exactly like" the jacket worn by the robber. Emmett suggests that discussing the omission with the jury violated his Fifth Amendment rights. To prevail, Emmett must show both that the challenged comments were improper and that they denied him a fair trial in light of the entire record. *United States v. Butler*, 71 F.3d 243, 254 (7th Cir. 1995). Emmett can do neither. "[A] prosecutor's comment regarding the balance of evidence or

its unrefuted nature is not improper and does not tax the self-incrimination privilege where there are other witnesses who could provide the rebuttal evidence." *Id.* at 255. Several witnesses (Mucha and Benkovich, to name two) could have testified as to Emmett's outfit, so his Fifth Amendment rights were not abridged. Moreover, given the overwhelming evidence against Emmett, the comments certainly did not make such an impact so as to deprive him of a fair trial.

Emmett also makes two arguments that his sentence should be reduced, for which he must show clear error. First, he argues that the district court should not have given him a 2-level increase for "a threat of death" under §2B3.1(b)(2)(F). A threat of death may be "an oral or written statement, act, gesture, or combination thereof. Accordingly, the defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply. . . . The court should consider that the intent of this provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is the victim of the offense, a fear of death." U.S.S.G. §2B3.1, cmt. n.6; *see also United States v. Raszkiewicz*, 169 F.3d 459, 468 (7th Cir. 1999) (threatening gesture alone can be enough to put a victim in fear of death sufficient to justify an increase); *United States v. Carbaugh*, 141 F.3d 791, 794-95 (7th Cir. 1998) (threatening language alone can be sufficient); *United States v. Hunn*, 24 F.3d 994, 998-99 (7th Cir. 1994) (threatening language combined with gesture can be sufficient).

Emmett claims he did not make a threat of death because the note he gave the tellers never suggested that he had a weapon. But the question is not whether Emmett told anyone he had a weapon, the question is whether his note and actions would put reasonable bank tellers in fear for their lives. Emmett handed both tellers notes

threatening that people would be harmed, which suggested that he had a weapon and was willing to use it. Emmett claims Vega's response (asking him whether he was serious) showed that she did not fear for her life, but such a response does not mean that reasonable tellers would not fear for their lives. *See Carbaugh*, 141 F.3d at 792 (2-level increase was appropriate where teller asked robber "are you for real?"). Moreover, in both banks Emmett put his hand into his jacket, which could lead a reasonable teller to believe he had a gun (as both Vega and Benkovich believed).

Finally, Emmett claims the district court should have granted grant him a 3-level decrease because his withdrawal from the banks made his efforts "attempts" under §2X1.1(b)(1), which provides:

> If an attempt, decrease by 3 levels, unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control.

Emmett claims he did not complete all of the acts necessary to complete either robbery. Specifically, he contends he could have told the tellers he had a gun or other weapon in an effort to make them comply with his demands. But the mere fact that a defendant could have tried something else does not entitle him to a guideline decrease. As the guidelines explicitly say, the 3-level decrease is not appropriate if Emmett did everything he thought was necessary to rob a bank. That's exactly what happened. Emmett gave the threatening note to Vega, the first teller, thinking that she would hand over the money he demanded. Had Emmett thought he needed to do more to complete the robbery, he would have taken addi-

tional steps when trying to rob the second bank. Instead, Emmett tried the exact same thing. The fact that he again failed does not mean that he did not think he was doing everything he needed to do in order to succeed.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*